# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **FRATERNAL ORDER OF POLICE /** | ) | |
| **DEPARTMENT OF CORRECTIONS** | ) | |
| **LABOR COMMITTEE**, *et al.*, | ) | |
|  | ) | |
|  | ) | **Civil Action No. 03-1727 (RMC)** |
| **Plaintiffs,** | ) | |
|  | ) | |
| **v.** | ) | |
|  | ) | |
| **ODIE WASHINGTON**, *et al.*, | ) | |
|  | ) | |
| **Defendants.** | ) | |
|  | ) | |

## MEMORANDUM OPINION

On August 5, 2003, the District of Columbia Department of Corrections ("DOC") conducted a "shake-down" at the Central Detention Facility, known as the "D.C. Jail," whereby all cells and common areas were searched for contraband. At the beginning of the next day, DOC also searched the lockers of all correctional officers and required each officer reporting for work that morning to consent to an automobile search as a condition of parking in a lot immediately adjacent to the D.C. Jail. The Fraternal Order of Police/Department of Corrections Labor Committee ("FOP") and certain correctional officers in leadership positions with FOP challenge the seizure of the automobiles, as well as the locker and automobile searches, on Fourth Amendment grounds.

After full briefing and oral argument on the cross-motions for summary judgment, the Court finds that the searches and seizures were lawful and that the Defendants' motion will be granted. The Plaintiffs' motion will be denied and the case dismissed.

## BACKGROUND

The D.C. Jail is located at 1901 D Street, S.E., Washington, D.C., on a publicly-

owned, 67-acre tract of land, historically known as Reservation 13.[1]  Reservation 13 contains several large buildings that also provide services for the D.C. Jail: the Correctional Treatment Facility ("CTF"); the D.C. General Hospital; D.C. Department of Health clinics; and the D.C. Medical Examiner.  Reservation 13 also contains extensive, interconnected, parking lots.  There are no fences or other physical barriers separating DOC property from the other areas of Reservation 13.  There are two main points of entry by foot into the D.C. Jail – a staff entrance and a visitors' entrance.

All persons entering the jail are subject to a pat search of their person, a search of any bags or containers they have with them, and must proceed through a metal detector.  Nonetheless, as with most jails, the D.C. Jail has received reports that some of its correctional officers transport weapons, drugs, and other contraband in their vehicles and onto the grounds of the jail in an attempt to smuggle them inside.[2]

On Wednesday, August 6, 2003, the D.C. Jail was placed into lockdown status and correctional officers began a "shake down" of all inmate cells and all common areas in search of items considered contraband under DOC regulations.  The lockdown continued until Friday, August 8, 2003.

At approximately 5:00 a.m. on August 7, 2003, senior officers of DOC searched the lockers of all correctional officers.  This search was ordered by Odie Washington, Director of DOC, pursuant to DOC's "Basic Regulations for Employees," Section 1.10, which states:  "It is required

---

[1]  The basic facts are not in dispute and are taken from the parties' presentations.

[2]  On November 17, 2002, an employee was caught smuggling marijuana into the jail.  On October 27, 2002, contraband items, including marijuana and PCP, were recovered from an inmate after he was seen receiving items from an employee.  In April 2002, an officer was discovered attempting to smuggle food into the jail for an inmate.

and constitutes a condition of employment that all personnel submit to a search of their person, or automobile, or place of assignment on government property, when such search is required by the Director or Superintendent." *See* Defendants' Motion for Summary Judgment ("Defs' Motion"), Exh. A, Decl. of Odie Washington, ¶ 2.

Male officers searched correctional officers' lockers located in the male locker room. Locker numbers 1 to 126 were searched. Two female officers searched the correctional officers' lockers located in the female locker room. All containers, coats, backpacks, and other items in the lockers were searched as well. Only nuisance contraband was located. The locker inspection was concluded at 6:15 a.m.

Later that morning, as correctional officers started to arrive for the 7:30 a.m. shift, DOC established a vehicle checkpoint at the Massachusetts Avenue entrance into Reservation 13. The checkpoint was manned by DOC officials, including Deputy Director Anthony. Two members of the Internal Affairs Division ("IAD") of the Metropolitan Police Department ("MPD") observed but did not take an active role. Two MPD police officers with a canine unit were present for some part of this activity but also did not participate.[3] Other entrances into Reservation 13 were blocked so that the Massachusetts Avenue entrance was the only way into the area at that time.

All correctional officers were ordered by DOC officials to stop at the checkpoint. They were informed that there was a vehicle search being conducted and were offered a "Vehicle Search Consent Form." The Consent Form stated:

> I _____ give formal consent to D.C. Department of
> Corrections and or members of the Metropolitan Police Department

---

[3] The MPD officers with the canine unit declined to participate because they were concerned that the parking lot was not used exclusively by DOC personnel.

to search the vehicle for which I am operating on this date, Thursday, August 07, 2003 at ___ hrs.

I am aware of the fact that I can deny any search of this vehicle before or during the search process.

I have not be[en] threatened, ordered or intimidated into submitting to a search of this vehicle.

The vehicle in question is described as a _____. Tag Number _____. State ___.

Defs' Motion, Exh. B.  After an officer signed this Consent Form, he or she exited the vehicle and its interior area was searched, including the glove compartment, trunk, and area under the seats.

Only one officer declined to sign the Consent Form.  He was directed to park elsewhere but was not disciplined.  Three correctional officers signed the Consent Form but also declared that they had weapons in their cars.  They were ordered to pull their vehicles out of the checkpoint line and to park them to the side.  These cars were not actually searched.  In the search of another vehicle, DOC discovered a loaded ammunition clip in the glove compartment.  The driver was told to move his vehicle to the side with the others.

Eventually, these correctional officers were directed to park their cars elsewhere, rather than on the lot used by DOC.  They parked off the premises and returned to work without incident.  No discipline or criminal charge was imposed.  Approximately eighty cars were searched on the morning of August 7, 2003.  Because of these numbers, cars were backed up onto Massachusetts Avenue and searches were conducted along that road and not solely on the grounds of Reservation 13.

The Court heard oral argument on the parties' cross-motions for summary judgment

in this case.  At the close of the argument, the Court instructed Defendants to submit a statement

explaining DOC policy regarding the search of employee automobiles.  In response, the Defendants

have advised:

> Defendants' policy is to seek written consent to search an employee's
> vehicle parked in the lot adjacent to the Jail which a [sic] policy that
> was followed in the instant case.  Defendants also take the position
> that an employee does not have a right to park in the Department's lot
> and, therefore, if an employee declines to consent to the search of his
> vehicle, he/she must park their vehicle someplace else.

Defendants' Response to the Court's Question Regarding the Department of Corrections' Policy for

Searching Employee Vhehicles [sic] at 2.

The Plaintiffs seek declaratory and injunctive relief that would render the searches

at issue unconstitutional and prohibit DOC from conducting such searches in the future, unless the

search is based upon a reasonable and individualized suspicion that an employee possesses or has

possessed contraband that he or she has attempted or may attempt to smuggle into the D.C. Jail.

Compl. at 12.  In addition, the Plaintiffs ask the Court to fashion an order that would prevent DOC

from searching an employee's locker absent the Director's finding of reasonable suspicion, his

express authorization to search an employee's locker, and full disclosure of the facts giving rise to

the finding of reasonable suspicion.  *Id.*  The Plaintiffs exclude from this request the search of

vehicles located at the vehicle entrance to the jail.  *Id.*

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material

fact and the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  This procedural device is not a

"disfavored legal shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Rather, it is a reasoned and careful way to resolve cases fairly and expeditiously.  *Id*.  In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case.  *Anderson*, 477 U.S. at 247-48; *Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

## ANALYSIS

The Fourth Amendment to the U.S. Constitution bans unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The Fourth Amendment vests individuals with the right to be free from "unreasonable government intrusions into their legitimate expectations of privacy."  *United States v. Chadwick*, 433 U.S. 1, 7 (1977).  These strictures apply to "people," not to "places," *Katz v. United States*, 389 U.S. 347, 351 (1967), and protect against arbitrary and oppressive governmental conduct.  *Michigan v. Tyler*, 436 U.S. 499, 504 (1978).

Whether a Fourth Amendment right has been violated depends upon the reasonableness of the government intrusion under the circumstances.  This requires that a court balance the intrusiveness of the search against the governmental interests involved.  *Illinois v. Lafayette*, 462 U.S. 640, 644 (1983).

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979). The content and incidents of Fourth Amendment rights are necessarily shaped by the context in which they are asserted. *Comm. for GI Rights v. Callaway*, 518 F.2d 466, 476 (D.C. Cir. 1975) (citing *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973)).

A.      *Seizure of the Cars*

There is no doubt that stopping the correctional officers' cars at the entrance to Reservation 13 constituted a "seizure" for Fourth Amendment purposes. *See Michigan Dept. of State Police v. Sitz* , 496 U.S. 444, 450 (1990) (a seizure occurs when a vehicle is stopped at a checkpoint). The Supreme Court has developed a three-pronged balancing test for evaluating the constitutionality of a checkpoint seizure in which individuals are stopped without any individualized suspicion.[4] "Consideration of the constitutionality of such seizures [that are less intrusive than a traditional arrest] involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 50-51 (1979).

The D.C. Jail is a maximum-security prison, the administration of which implicates weighty "penological imperatives of maintaining prison security and preserving order and

---

[4] The Plaintiffs argue that some level of individualized suspicion is necessary under most circumstances but concede that it is not the "irreducible" component of reasonableness. *See* Pltfs' Memorandum in Support of Motion for Summary Judgment at 6 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976)).

discipline." *Sec. and Law Enforcement Employees, Dist. Council 82 v. Carey*, 737 F.2d 187 (2d Cir.

1984).

> "Prison administrators . . . should be accorded wide-ranging deference
> in the adoption and execution of policies and practices that in their
> judgment are needed to preserve internal order and discipline and to
> maintain institutional security."  That deference extends to a prison
> security measure taken in response to an actual confrontation with
> riotous inmates, just as it does to prophylactic or preventive measures
> intended to reduce the incidence of these or any other breaches of
> prison discipline.  It does not insulate from review actions taken in
> bad faith and for no legitimate purpose, but it requires that neither
> judge nor jury freely substitute their judgment for that of officials
> who have made a considered choice.

*Whitley v. Albers*, 475 U.S. 312, 322-23 (1986) (quoting *Bell v. Wolfish*, 441 U.S. at 547).  The

Plaintiffs agree that keeping contraband out of the D.C. Jail is an imperative and that DOC's

professed interest meets the first prong of the *Brown v. Texas* test regarding the "gravity of the public

concerns." *Brown*, 443 U.S. at 50-51.

The Plaintiffs argue, however, that the seizures failed to meet the second factor of the

*Brown v. Texas* test because they did not advance the interest of keeping contraband out of the D.C.

Jail.  *See Delaware v. Prouse*, 440 U.S. 648, 659 (1979) (court must evaluate whether a checkpoint

"is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests

which such stops entail.");  *United States v. McFayden*, 865 F.2d 1306, 1311-12 (D.C. Cir. 1989)

(following *Prouse*).  They propose that there is no empirical evidence that such car seizures have any

effect on keeping contraband out of the D.C. Jail.  Further, the Plaintiffs assert that common sense

"cuts sharply against any claimed effectiveness of the checkpoint seizures at issue because

Correctional Officers are not required to park on what is allegedly DC DOC property within

Reservation 13" and can readily park elsewhere.  Plaintiffs' Opposition to Defendants' Motion for

Summary Judgment at 9.

These arguments are insufficient to carry the point.  This was the first time that DOC established such a checkpoint.  Therefore, there was no history to provide empirical evidence of past successes.  No new use of a specific checkpoint could ever be adopted if its reasonableness depended upon past checkpoints for constitutional legitimacy.  The purpose of the checkpoint was to afford an opportunity to inform officers of the activity, present Consent Forms, and search the vehicles of those who consented.  For this purpose, the checkpoint and the "seizures" were assuredly reasonable.

The Plaintiffs' argument that a correctional officer can park his car somewhere other than in the lot adjacent to the D.C. Jail and walk into Reservation 13 is inapposite.  This common sense fact does not undermine the reasonableness of stopping all vehicles at the checkpoint on August 7, 2003.  The checkpoint was necessary to initiate the searches of the vehicles.  An officer who did not want his vehicle searched, as one did not, could decline and park his car elsewhere.

Finally, the Plaintiffs argue that, under the third factor of the *Brown v. Texas* inquiry, the severity of the intrusion on the correctional officers' individual liberties and privacy was substantial, in violation of their Fourth Amendment interests.  They note that these were not brief stops because each officer was required to exit his or her vehicle and wait while the interior was searched.  In addition, these stops were attended by high-ranking officials of DOC, MPD officers with a trained search dog, and representatives from IAD. There was no prior notice and no signs indicating that vehicles entering the public lots on Reservation 13 were subject to search.  Those drivers who were not officers assigned to the D.C. Jail were allowed entrance to the reservation without significant delay.  This combination of circumstances is alleged to have created subjective fear, anxiety, and annoyance that also rendered the seizures unconstitutional.

The checkpoint was set up to encounter the 7:30 a.m. shift.  The purpose of the checkpoint was two-fold:  to identify correctional officers who worked at the D.C. Jail so that others could be released, to notify the relevant officers of the intended searches, and to solicit their consent to a search of their vehicles.  Under the current climate of heightened security in Washington, D.C., the Court finds it difficult to conclude that these correctional officers were surprised at this first checkpoint at the D.C. Jail, or alarmed to a constitutional degree.  The severity of the interference with individual liberty was not great, most especially in the context of officers who work at a maximum security prison.

B.     The Car Searches

All parties agree that an individual has a privacy interest in his automobile that is protected by the Fourth Amendment.  *See California v. Carney*, 471 U.S. 286, 390 (1985).  This interest is not, however, particularly strong and must cede to a reasonable search under certain circumstances.  *See New York v. Class*, 475 U.S. 106, 112-13 (1986) (person has lesser expectation of privacy in motor vehicles);  *United States v. Maple*, 348 F.3d 260, 261 (D.C. Cir. 2003) (same); *United States v. Green*, 465 F.2d 620, 623 (D.C. Cir. 1972) ("it is clear that an automobile is entitled to less privacy than a home").  Even absent this presumption, "a legal search conducted pursuant to voluntary consent is not unreasonable and does not violate the fourth amendment."  *McDonell v. Hunter*, 809 F.2d 1302, 1310 (8th Cir. 1987).  *See Katz*, 389 U.S. at 358 (search authorized by voluntary consent is valid);  *Schneckloth v. Bustamante*, 412 U.S. 218, 227 (1973) (same).

There is no "talismanic definition of 'voluntariness,'" *Schneckloth*, 412 U.S. at 224, and whether a consent to a search was voluntary is "a question of fact to be determined from the totality of all the circumstances."  *Id*. at 227.  This determination can be fraught with difficulty,

requiring a balance of the need for governmental action while preserving the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government" overreaches. *Id.* at 225. Such difficulties are not present on the facts here.[5]

The Plaintiffs consented to the searches of their vehicles but argue that the consents were not truly voluntary because of the extraordinary nature of the event and the presence of superiors and other persons with authority. But, the Consent Forms state in clear and unambiguous language that the officers could deny the search at any time and affirm that the officers were not "threatened, ordered or intimidated" into submitting to the search. Defs' Motion, Exh. B. The record reveals that one officer declined to have his car searched and suffered no discipline.

Indeed, DOC has clarified that its policy is to obtain an employee's consent before searching any vehicle in the lot adjacent to the jail. Such an institutionalized policy also provides some assurance that the consents were voluntary and properly obtained. There does not appear to be subtle coercion nor undue influence under these facts and the consents appear to be "the product of an essentially free and unconstrained choice by [their] maker." *Schneckloth*, 412 U.S. at 225.

## C. The Locker Searches

Implicit in any Fourth Amendment determination is an appreciation of the individual's expectation of privacy under particular conditions.[6] While correctional officers retain

---

[5] Although the "voluntariness inquiry turns not on whether a 'reasonable' person" would have felt compelled to consent but, rather, on whether the particular individual felt compelled to consent, *United States v. Hall*, 969 F.2d 1102, 1107 (D.C. Cir. 1992), the Plaintiffs have not presented credible evidence that any of the individuals felt compelled to consent to the searches of their vehicles.

[6] The Supreme Court in *Katz v. United States* established a two-part test for determining whether a person has a legitimate expectation of privacy. "There is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the

-11-

Fourth Amendment rights despite their professional occupation, "[a] federal penal institution has peculiar needs." *United States v. Chatman*, 538 F.2d 567, 569 (4th Cir. 1967). "That which would be unreasonable in the outside world may be indispensable within a prison." *Newman v. State of Alabama*, 559 F.2d 283, 291 (5th Cir. 1977).

The Court of Appeals for the District of Columbia has recognized that certain professions necessarily involve a lesser expectation of privacy. In *Committee for GI Rights v. Callaway*, the Court of Appeals explained that those in the military cannot expect the same level of privacy as civilians due in part to the tradition of extensive regulation and inspection in the military. 518 F.2d at 477. While there is no case on point in this Circuit specifically prescribing the expectation of privacy for correctional officers, other circuits have found that society is prepared to recognize a diminished expectation of privacy for correctional officers. In *Sec. and Law Enforcement Employees, Dist. Council 82 v. Carey*, the Court of Appeals for the Second Circuit found that "within the confines of correctional facilities," society is not prepared to recognize "the existence of the more substantial expectations that ordinary citizens generally enjoy as free persons in the community." 737 F.2d at 202. A prison guard's right of privacy "must yield to the need for the State to maintain institutional order and discipline." *Id*. at 213 (Van Graafeiland, J., concurring in part and dissenting in part).

The Plaintiffs' expectations of privacy inside the D.C. Jail are lessened by virtue of the location and the duties they are required to perform. *See Profitt v. District of Columbia*, 790 F. Supp. 304, 307 (D.D.C. 1991) (taking into consideration the context of the search and the tradition of judicial deference to prison administrators). Further, work-related searches, if performed to

expectation be one that society is prepared to recognize as 'reasonable.'" *Katz*, 289 U.S. at 361.

investigate "work-related misconduct" are reasonable under the Fourth Amendment if they are "reasonable under all the circumstances." *O'Connor v. Ortega*, 480 U.S. 709, 725-26 (1987).

The locker searches were conducted in the early morning hours by correctional officers of the same gender as the correctional officers whose lockers were being searched.[7] The lockers are provided by DOC for the convenience of the correctional officers. The assigned officer and the Director have keys to each locker and locker assignments can be changed without notice by the Director. Importantly, prison regulations clearly state that it is "required and constitutes a condition of employment that all personnel submit to a search of their person, or automobile, or place of assignment on government property, when such search is required by the Director or Superintendent." *See* Defs' Motion, Exh. A, para 2.

All parties agree that the D.C. Jail, its Director, and the correctional officers share an interest in purging the jail of contraband. In addition, the scope of the intrusion was minimal, the manner of the searches was not coercive, and the locker searches were conducted without embarrassment to any employee. Therefore, "the scope of the particular intrusion, the manner in which it [was] conducted, the justification for initiating it, and the place in which it was so conducted" were not unreasonable under the Fourth Amendment. *Bell v. Wolfish*, 441 U.S. at 559.

**CONCLUSION**

The Court finds that there is no evidence of bad faith behind the "seizure" of the cars or the searches of either cars or lockers. The purpose of the seizures and searches was legitimate and the Court will not substitute its judgment for the considered judgment of the Director. *See Whitley*, 475

---

[7] It appears that no one lingered over the private belongings of any correctional officer; fully 126 lockers of male officers were searched between 5 a.m. and 6:15 a.m.

U.S. at 322-23 (deference given to decisions of prison administrators).  The Plaintiffs' motion for summary judgment will be **DENIED** and the motion of the District of Columbia for summary judgment will be **GRANTED**.  The case will be **DISMISSED**.

A separate Order accompanies this Memorandum Opinion.


Dated: January 11, 2005.                                     /s/ _____
                                                             ROSEMARY M. COLLYER
                                                             United States District Judge